**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**J.R. AND D.M.R., INDIVIDUALLY AND ON BEHALF OF J.R.,**
**A STUDENT WITH A DISABILITY,**

                                    **Plaintiffs,**

**v.**
                                                            **18-CV-859(JLS)**

**THE BOARD OF EDUCATION FOR THE IROQUOIS**
**CENTRAL SCHOOL DISTRICT,**

                                    **Defendant.**

_____

### REPORT, RECOMMENDATION, AND ORDER

Plaintiff J.R.[1] and D.M.R. ("the Parents") commenced this action seeking

reimbursement for tuition and expenses paid to the Gow School ("GOW") for their

learning disabled daughter, J.R. ("J.R." or "the Student"), during the 2015-2016 and

2016-2017 school years.  Dkt. No. 1.  The Parents contend that the Board of Education

for the Iroquois Central School District ("the District") failed to provide J.R. with a Free

Appropriate Public Education ("FAPE") as required by the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*  Dkt. No. 1.


This case was referred to the undersigned by the Hon. Lawrence J.

Vilardo, pursuant to 28 U.S.C. § 636(b)(1)(A), for all pretrial matters and to hear and

report on dispositive motions.  Dkt. No. 9.  The case was thereafter reassigned to the

Hon. John L. Sinatra.  Dkt. No. 29.  Currently before this Court are the District's Motion

for Summary Judgment (Dkt. No. 20) and the Parents' Cross-Motion for Summary

---

[1] Father and daughter share the initials "J.R."  References to J.R. within this decision are to the
Student.

Judgment (Dkt. No. 22).  For the following reasons, it is RECOMMENDED that the District's Motion be GRANTED, and the Parents' Cross-Motion be DENIED.

## THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

"To receive federal funding under the IDEA, states are required to provide disabled children with a 'free appropriate public education.'"  *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (quoting 20 U.S.C. § 1412(a)(1)(A)).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child."  *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d)); *see also Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,* 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system).  An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,* 465 F.3d 503, 507-08 (2d Cir. 2006) (internal quotation marks omitted), *amended on denial of rehearing by D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 480 F.3d 138, 140 (2d Cir. 2007).

To be adequate under the IDEA, a child's IEP must be "tailored to meet the unique needs of [that] particular child," *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012), and "afford[ ] the student with an opportunity greater than mere trivial advancement.'"  *Id.* (citing *T.P.*, 554 F.3d at 254, and *Cerra v. Pawling Cent. Sch.*

*Dist.*, 427 F.3d 186, 195 (2d Cir. 2005)).  Overall, an IEP must be likely to produce

progress, rather than regression.  *Id.*  It need not, however, "furnish every special

service necessary to maximize each handicapped child's potential."  *Grim v. Rhinebeck*

*Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (internal quotations omitted).  Under

an IEP, "education [must] be provided in the 'least restrictive setting consistent with a

child's needs.'"  *Grim*, 346 F.3d at 379 (quoting *Walczak v. Florida Union Free Sch.*

*Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

An eligible child's IEP is created by a local Committee on Special

Education ("CSE"), composed of the student's parent or parents, a regular or special

education teacher, a school psychologist, a school district representative, an individual

who can interpret the instructional implications of evaluation results, a school physician,

and a parent of another student with a disability.  *See* N.Y. EDUC. LAW §

4402(1)(b)(1)(a).  The CSE members "must examine the student's level of achievement

and specific needs and determine an appropriate educational program."  *R.E.*, 694 F.3d

at 175 (citing *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-108 (2d Cir.

2007)).

If a parent believes that the local CSE has "fail[ed] to provide their

disabled child a FAPE, the parent may unilaterally place their child in a private school at

their own financial risk and seek tuition reimbursement."  *M.W. ex rel S.W. v. N.Y.C.*

*Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (internal citations omitted).  If the

parent cannot "front" the costs of private school tuition, he or she may "request direct

retroactive payment to the private school." *Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 427-29 (S.D.N.Y. 2014) (citing *Mr. & Mrs. A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 427-29 (S.D.N.Y. 2011)).

A parent seeking tuition reimbursement must file a due process complaint to initiate a hearing before an Impartial Hearing Officer ("IHO") appointed by the local board of education. *See M.W.*, 725 F.3d at 135; 20 U.S.C. § 1415(f); N.Y. EDUC. LAW § 4404(1). At the hearing, "the school district has the burden of demonstrating the appropriateness of the proposed IEP." *Grim*, 346 F.3d at 379. Should the school district fail to show that the services provided to the student were adequate to afford the child an appropriate public education, the parents will be awarded tuition reimbursement if they meet their burden to show that the child's private school placement was appropriate and that the equities favor reimbursement. *See M.W.*, 725 F.3d at 135 (citations omitted). "An IHO's decision may, in turn, be appealed to a State Review Officer ('SRO'), who is an officer of the State's Department of Education." *M.H.*, 685 F.3d at 225 (citing *Grim*, 346 F.3d at 379-80); N.Y. EDUC. LAW § 4404(2). Any "party aggrieved" by the SRO's final administrative decision may seek review of it by bringing a civil action in state or federal court. *See M.W.*, 725 F.3d at 135-36.

## MOTION FOR SUMMARY JUDGMENT IN AN IDEA CASE

A federal court reviewing an SRO's decision must examine the entire administrative record and must hear additional evidence if either party requests it. *See* 20 U.S.C. 1415(i)(2)(C). Procedurally, "[t]he court typically considers the propriety of

the IEP on the parties' cross motions for summary judgment." *M.H.*, 685 F.3d at 225.

As the Second Circuit Court of Appeals noted in *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*:

> [A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits.

397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted). "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." *M.H.*, 685 F.3d at 226.

The role of the federal courts in reviewing state educational decisions under the IDEA is "circumscribed." *Gagliardo*, 489 F.3d at 112; *see also Grim*, 346 F.3d at 380-81 (interpreting the IDEA as "strictly limiting judicial review of state administrative decisions"). A reviewing court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" *Gagliardo*, 489 F.3d at 112. That said, judicial review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Gagliardo*, 489 F.3d at 113-114 (internal quotations omitted). "To the contrary, federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489 F.3d at 113; *see*

*also Walczak*, 142 F.3d at 129 (stating that "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings").

Relegated to this narrowly circumscribed role, district courts are not permitted to make "subjective credibility assessment[s]," and cannot "ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who [have] heard the same evidence." *Grim*, 346 F.3d at 383. For this reason, district courts generally "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal citations omitted).

Deference to the final decision, that of the SRO, is particularly appropriate when "the state hearing officers' review has been thorough and careful," *Walczak*, 142 F.3d at 129, and his or her factual findings are "reasoned and supported by the record." *Gagliardo*, 489 F.3d at 114. "Reviewing courts must look to the factors that 'normally determine whether any particular judgment is persuasive[,]'" and must ultimately "defer to the SRO's decision on matters requiring educational expertise unless [the court] concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 144 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 934, 205 L. Ed. 2d 522 (2020) (quoting *R.E.*, 694 F.3d at 189, in turn quoting *M.H.*, 685 F.3d at 244, 246).

**FACTUAL BACKGROUND**

**J.R.'s Educational History in the District[2]**

J.R. attended the District from preschool until January of 2016, when she began attending GOW. Dkt. No. 20-1, ¶ 10; Dkt. No. 22, ¶ 7. At that time, J.R. was 16 years old and in the middle of her 10th grade year. Dkt. No. 20-1, ¶ 10; Dkt. No. 22, ¶ 7. At all relevant times, J.R. suffered from dyslexia, an "invisible disability" which in J.R.'s case, manifested itself "through difficulties with timed tasks especially in reading fluency." Dkt. No. 22, ¶ 7; Dkt. No. 20-1, ¶ 11. J.R. was first referred to the District's Committee on Preschool Education when she was 4 years old based on concerns about her speech articulation. Dkt. No. 22, ¶ 8; Exh. P-G at 1; Exh. P-H at 1.[3] The Committee

---

[2] The following facts are taken from the uncontested portions of Allison B. Fiut's Declaration in Support of Motion for Summary Judgment (Dkt. No. 20-1); H. Jeffrey Marcus' Declaration in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to the District's Motion for Summary Judgment (Dkt. No. 22); and from the administrative record itself. Plaintiffs argue that Mrs. Fuit's Declaration "consists primarily of argument," which should be stricken. While Ms. Fuit's Declaration does contain some subjective characterizations of J.R.'s education performance ("Despite her dyslexia diagnosis, the Student excelled in the District," Dkt. No. 20-1, ¶ 7), and the SRO's decision (". . . the SRO correctly rules that the Parents' reimbursement of claims fails under the first prong of the governing three prong tuition-reimbursement standard," Dkt No. 10-1, ¶ 56), counsel does not mask these characterizations as facts. Counsel also refers this Court to specific evidence upon which each paragraph or statement of fact is predicated. Under the circumstances, this Court finds that striking all but a few of the paragraphs of the Declaration is unnecessarily draconian. This Court relies on the underlying administrative record whenever possible.

[3] The administrative record consists of the Parents' Impartial Hearing Exhibits (Exhs. P-A through P-EE); the District's Impartial Hearing Exhibits (Exhs. D-1 through D-71) and the transcript of the impartial hearing testimony (Tr.). The following witnesses gave testimony before the Impartial Hearing Officer ("the IHO"): Ms. Kristin Kendall-Jakus, the District's Director of Student Services (Tr. at 56-244); Ms. Melissa Albrechcinski, the District Psychologist (Tr. at 245-280, 354-471); Sharon Chase-Hawkins, J.R.'s Special Education Teacher at the District (Tr. at 295-319); Rebecca Guido, J.R.'s English Teacher (9th and 10th grade) at the District (Tr. at 320-41); Robin Marshman, Head of the Upper School at GOW (Tr. at 471-524); Kathleen Rose, Chairperson of Reconstructive Language at GOW (Tr. 527-78); Dr. Mary Jo Renick, Director of Research and Assessment at GOW (Tr. at 584-736); D.M.R., J.R.'s mother (Tr. at 737-793); and Brian Warren Thompson, Reconstructive Language and History instructor at GOW (Tr. at 794-807).

recommended that J.R. receive speech therapy.  Dkt. No. 22, ¶ 8; Exh. P-G at 1; Exh.

P-H at 1.  While J.R. was in kindergarten, the District classified her as "speech impaired

" and determined that she needed both Academic Intervention Services and speech

therapy.  Dkt. No. 22, ¶ 8; Exh. P-H at 1-2.

        In the Summer of 2006, prior to J.R. entering 1st grade, Lisa A. Jackson,

Ph.D. evaluated J.R. and diagnosed her with a Reading Disorder, Disorder of Written

Expression, and sporadic memory weaknesses.  Exh. P-H at 1, 8.  To remediate these

deficits, the District enrolled J.R. in various reading programs, including the "Sonday

System Reading Program," an Orton-Gillingham based reading program.  Exh. P-G at

2.  J.R. significantly improved over the year and the district declassified her from

services.  Exh. P-G at 2-3.  Because she was not classified for special education, J.R.

did not have an IEP in her 4th, 5th, and 6th grade years.   Dkt. No. 20-1, ¶¶ 12, 13.

Rather, J.R. was supported by a Section 504 Accommodation Plan pursuant to the

Rehabilitation Act ("504 Plan").  Dkt. No. 20-1, ¶¶ 12, 13.  J.R.'s 504 Plan

accommodations included assistive technology, extended time for academic tasks,

advanced notice of tests and long-term assignments, preferential seating, and copies of

class notes.  Exh. D-9 at 5; Exh. D-12 at 5-6; Exh. D-15 at 7-9; Exh. D-18 at 8-9.  J.R.

consistently earned grades in the very high 90s.  Exhs. D-61 through D-65.

        In August of 2012, just prior to J.R.'s 7th grade year, the CSE re-classified

her as a student with a disability and provided her with an IEP.  Exh. D- 9.  J.R.'s

classification was predicated on a psychoeducational evaluation by Mari Jo Renick,

Ph.D. of GOW, which the Parents solicited over the Summer (Exh. D-69; Exh. P-G), as well as J.R.'s below-average reading fluency performance on the District's "AIMSweb" testing.  Exh. D-11 at 1.  In relevant part, J.R.'s 2012 IEP stated:

> [J.R.] consistently earns A's on her report card, but has to work exceptionally hard to earn those grades because reading fluently is challenging for her.  The evaluator . . . reported, "The pattern of [J.R.'s] scores, which includes conceptual strengths within the gifted range and specific skill deficits, the types of errors made, and her learning history evidence . . . dyslexia.["]

Exh. D-9 at 2.  The IEP acknowledged that "[J.R.] is an extremely hardworking, conscientious student."  Exh. D-9 at 2.

According to the August 2012 IEP, J.R. required "explicit, systematic reading instruction" to fulfill the "primary need" of "increase[ing] her reading fluency." Exh. D-9 at 3.[4]  A corresponding reading fluency goal was developed which required her to increase her score on AIMSweb testing from 125 to 150 words read correctly per minute by the Spring of 2013, with bi-weekly progress monitoring.  Exh. D-9 at 4.  J.R.'s fluency was measured and recorded using different measures, yielding different results. According to a narrative progress report by Anne Schiller, J.R., then a 7th grader, was reading at a 5.6 grade level at 127 words per minute in "Read Natural" in November of 2012.  Exh. D-15 at 1.  On January 25, 2013, Mrs. Schiller reported, "[o]n the Winter AIMS[web] testing in January, [J.R.] scored 114 words per minute, up 10 from the fall test."  Exh. D-58 at 1.  Although Mrs. Schiller's narrative report indicates that J.R.

---

[4] In September 2012, J.R.'s IEP was updated to provide for assistive technology and accommodations, including presenting assignments in small chunks, wait time, a copy of class notes, no penalty for misspelling, preferential seating, audio versions of texts, access to a word processor, and testing accommodations.  Exh. D-12 at 5-7.

"mastered" her goal of increasing "words read correctly per minute from 104 to 150" on April 17, 2013, it is unclear how this is possible as the same report explicitly states that on April 19, 2013, J.R. was reading 117 words per minute according to progress monitoring in AIMSweb.  Exh. D-58 at 1.

J.R. ended her 7th grade school year "at grade level," but according to her teachers, did "poorly in timed situations."  Exh. D-13 at 2.  At J.R.'s March 7, 2013 CSE meeting, her parents reported that she had "not been doing well since February," was "overwhelmed spending a large amount of time on homework," and had recently "not wanted to come to school."  Exh. D-16 at 2.  The CSE noted "improvement" with the corrective reading program, but recognized that J.R. continued to score "below average" in reading fluency and comprehension according to the District's AIMSweb testing.  Exh. D-15 at 4.  J.R. scored a "Level 2" on her Grade 7 ELA and Math New York State Tests (D-18 at 4), which is "below standards" according to Kristin Kendall-Jakus, the District's Director of Student Services.  Tr. at 84, 182-84, 238.

In J.R.'s 8th grade year (2013-2014), she continued to receive resource room assistance every other day as well as direct consultant teacher services in math two times in a six day cycle.  Exh. D-15 at 7.  Fluency remained J.R.'s greatest area of need.  Exh. D-16 at 2 (the March 7, 2013 CSE, noting that while J.R.'s comprehension is almost at grade level, "it is her fluency that she struggles with").  Over the academic year, J.R.'s fluency was measured and recorded on several different reports, which were at times inconsistent with one another.  According to AIMSweb testing, J.R. was

"well below average" in "Reading – Curriculum Based Measurement," but "average" in "MAZE -Comprehension."  Exh. D-56 at 1-2.

Mrs. Schiller reported in June of 2013, at the end of J.R.'s 7th grade year, that J.R. was "near her target rate of 147 words read correctly per minute," but noted on November 8, 2013, when J.R. was in the 8th grade, that "[J.R.] consistently reads 128 words per minute correctly or higher."  Exh. D-58-1 at 1.[5]  Another narrative report, this one authored in relevant part by Jennifer Hand, noted that J.R. reached her goal to read "150 words per minute on a 7th grade fluency passage with no more than 7 errors," only once achieving 150 words/2 errors out of eight times between April 4, 2014 and June 26, 2014.  Exh. D- 59 at 1.  Yet another report, detailing J.R.'s AIMSweb results, shows that J.R. met or exceeded this same goal five times out of 14 between October 4, 2013 and February 21, 2014.  Exh. D-55 at 1-2.

J.R. ended her 8th grade year with a final GPA of 95.92, even earning the foreign language credit necessary for a Regents diploma.  Exh. D-63; Tr. at 133-35. D.M.R., the Student's mother, reported that J.R.'s 8th grade experience was "outstanding."  Exh. D-19 at 1.  J.R.'s teacher stated that although J.R. was at 50% for seventh grade in fluency, J.R.'s writing was strong compared to her classmates and she

---

[5] According to this report, J.R.'s fluency was measured at a 6th grade reading level given her stated goal: "Given a fluency passage at her reading level (6th), [J.R.] will read words correctly to place in the 50th percentile."  Exh. D-58-1 at 1.  The District contends that although J.R.'s fluency reading goal provided that she was reading passages at the sixth grade level, this was a clerical error (later corrected by amendment) and that J.R. was actually reading 7th grade level material.  Dkt. No. 20-1, p. 5; Tr. at 119-121, 465-470; Exh. D-21 at 8; Exh. D-22; Exh. D-23.

was "ready for HS."  Exh. D-19 at 1.  J.R's January 2014 IEP described her reading fluency as between the 25th and 50th percentile of the 6th grade level," a likely clerical error or typo given later amendments to other sections of the IEP to reflect 7th grade, rather than 6th grade, fluency goals.  Exh. D-18 at 4; Exh. D-23 at 1.

In J.R.'s 9th grade year (the 2014-15 school year), she was co-taught English and Math, meaning she had both a general education and a special education instructor in a general education classroom.  Exh. D-18 at 8.  She also participated in a special class study hall, a small, structured study hall in which special education students can be re-taught their general education curriculum and get other supports.  Exh. D-18 at 8; Tr. at 298-99; Exh. D-36 at 8; Exh. D-41 at 8.  J.R.'s specialized reading support was removed on September 2, 2014, at the request of J.R.'s mother.  Tr. at 136.  This request, and the subsequent removal of the reading support, was predicated on the belief that J.R. had mastered her fluency goals.  Tr. at 137.  Although she normally would have convened the CSE to remove corrective reading instruction, Ms. Kendall-Jakus did not do so in J.R.'s case; rather, she amended J.R.'s IEP without a meeting citing to her honor roll performance in middle school and her purported mastery of her reading goals.  Exh. D-32; Exh. D-33; Exh. D-34; Exh. D-35; Tr. at 136.  Because specialized reading support was removed, so was J.R.'s reading fluency goal and corresponding progress monitoring.  Exh. D-37; Exh. D-38; Tr. at 140-44.

The CSE convened on December 8, 2014 to discuss J.R.'s curriculum supports for the next school year, J.R.'s 10th grade year.  Exh. D-41; Exh. D-42; Exh. D-

43; Tr. at 740-41.  According to the meeting minutes, J.R.'s parents reported that J.R. "has done wonderfully."  Exh. D-42 at 1.  Writing was considered J.R.'s "only area of need."  Exh. D-42 at 1.  The CSE discussed re-evaluating J.R., who was due for her triennial review, and agreed that, "Mom will have one completed at GOW this coming summer."  Exh. D-42 at 1.  The District's psychologist, Melissa Albrechcinski, testified: "J.R. was due for a re-evaluation.  Mrs. D.M.R. preferred to go to GOW to have the re-evaluation completed, so that was honored by myself."  Tr. at 379.

Although it is not reflected in the minutes, J.R.'s parents testified that it was recommended that J.R. be declassified "because the classes that J.R would be taking . . . wouldn't get the special ed[ucation] teacher in the classroom."  Tr. at 741. Ms. Albrechcinski testified that students are not foreclosed from classes in the District based on the fact that they have an IEP.  She recalled that J.R.'s counselor recommended that J.R. be declassified because she was so high-achieving.  Tr. at 432, 434.[6]  The CSE discussed "where [J.R.] was at and that she was doing very, very well and that we would consider [declassifying her] at the end of the year."  Tr. at 378-79.

At the end of her 9th grade year, J.R.'s final grades were 91 percent or higher in all of her classes, resulting in a GPA of 94.8.  Exh. D-64.  At all times during that year, J.R. received the same curriculum as her non-disabled, general education peers.  Tr. at 304-305, 330.  In fact, J.R.'s only IEP goal was a writing goal (Exh. D-41 at 8), which she satisfied by completing a research paper for English Language Arts that

---

[6] J.R.'s 10th grade transcript did not reflect enrollment in any advanced placement classes. Exh. D-65; Exh. D-66; Exh. D-67.

was "cohesive and well-written," according to her 9th grade special education teacher,

Sharon Chase-Hawkins.  D-60 at 1.  According to Ms. Chase-Hawkins, J.R. "very rarely"

utilized her support in her English and study hall classes.  Tr. at 310-11.  Also during the

school year, J.R. passed the Common Core Algebra I and Physical Setting/Earth

Science Regents Exams.  Exh. D-64.  J.R.'s parents were in "full support" of

declassifying her and did not request any updated testing.  Tr. at 382, 744-45.

Accordingly, at the May 2015 meeting, the CSE agreed that J.R. would be declassified,

meaning that she would no longer receive special education services through an IEP.

Exh. D-45; Tr. at 380-88.  It was also agreed that any accommodations that J.R. needed

to address her dyslexia – such as preferential seating, wait time to process information,

copies of class notes, advance notification for tests, testing in a location with minimal

distractions, extended time, waiver of spelling requirements – would be met through a

504 Plan.  Exh. D-44 at 1-2; Tr. at 313-14, 387-89.  Accordingly, J.R. was declassified

and her new 504 Plan was implemented on June 11, 2015, without the benefit of

additional testing.  Exh. D-44 at 1.


       The Parents did not have J.R. evaluated at GOW over the Summer of

2015.  Tr. at 745-46.  So, Ms. Albrechcinski offered to evaluate J.R. in the Fall of 2015,

at the beginning of her 10th grade year.  Tr. at 746.  J.R. scored as high average for

verbal comprehension, average for perceptual reasoning, processing speed, and full-

scale IQ, and borderline for working memory.  Exh. D-71 at 2.  J.R.'s "achievement

scores fell within the average range for most areas of reading and math when time

constraints were not given," but she scored below average on fluency subtests, or timed

measures, of reading and mathematics.[7]  Exh. D-71 at 5.  According to the District,

J.R.'s scores indicated "that [she] needs additional time to process information

consistent with previous and current observations, previous psychological reports, [and]

teacher and parent reports."  Exh. D-71 at 5.  J.R.'s broad reading score was an 87, a

low average score.  *Compare* Exh. D-71 at 3 *with* Exh. D-69 at 7.  Ms. Albrechcinski

acknowledged that the 2015 scores were "consistent with" the results of J.R.'s 2012

GOW evaluation, which formed the basis for J.R.'s classification.  Tr. at 356-57.


        The Parents never requested that J.R. be referred back to the CSE, but

did raise concerns that J.R.'s 504 Plan was not being fully implemented.  Exh. D-48;

Exh. P-CC, Tr. at 225-26, 387.  The Parents were especially concerned that J.R.'s

teachers were not providing her with advance notice of her assignments and tests.  Exh.

D-48 at 1; Tr. at 225-26, 397-98.  According to her mother, J.R. worked long hours each

night with the help of her Parents to keep up with her schoolwork.  Tr. at 755-57.  J.R.'s

anxiety "heightened as things got progressively worse at school," her mother later

testified.  Tr. at 773.  In response to the Parents' concerns, the District added the

following accommodations to J.R.'s 504 Plan:  allowing her to take a break to meet with

a trusted adult in school, arranging a meeting with each of J.R.'s teachers and her

Parents to review the 504 Plan and help the teachers to understand J.R.'s disability;

---

[7] At the impartial hearing, Kathleen Rose, the Chairperson of Reconstructive Language at GOW, testified that reading fluency difficulties can be properly addressed through accommodations such as extra time, rather than special education services.  Tr. at 574.  Ms. Albrechcinski opined that providing J.R. with additional time would adequately accommodate her deficiency in reading fluency.  Tr. at 423-25.

and scheduling a meeting with J.R. and her counselor two times per month.  Exh. D-47 at 2.

For the Fall 2015 semester, J.R. had a GPA of 96.36 with a grade of 93 or above in all of her subjects within the general education curriculum.  Exh. D-65; *see also* Exh. D-66.  Rebecca Guido, the Student's 9th and 10th grade English teacher, later testified that J.R. was able to complete her in class assignments, which included general education reading and writing assignments, tests and quizzes, in a timely manner.  Tr. at 328-35, 340-41.  Based on her academic performance, the District anticipated that J.R. would receive a Regents diploma and go on to college.  Tr. at 166, 335.

On December 1, 2015, Dr. Renick of GOW once again evaluated J.R., who was then 16 years old.  Exh. P-I at 1.  Various measures yielded the following scores:  *Iota Word List Test* – Grade Equivalent ("GE") 5.3; *GOW Nonword Test Score* – 57% correct; *Slosson Oral Reading Test (Revised)* – GE 6.8; *Gray Oral Reading Test/ 5th Edition (Form B)* – GE 6.2 on Rate, GE 4.4 on Accuracy, GE 5.4 on Fluency, GE 7.0 on Comprehension; *Morrison-McCall Spelling Test (Written)* – GE 6.4; *Test of Written Language (4thEdition)* – Contextual Conventions: 84th Age Percentile, Story Composition: 75th Age Percentile, Spontaneous Writing Quotient: 87th Age Percentile*; Rapid Automatized Naming &Rapid Alternating Stimulus Tests (RAN/RAS)* – Below Average on naming of Numbers/Letters/Colors only.  J.R.'s mother testified that when Doug Cotter, GOW's Director of Admissions, went over J.R.'s results, she was shocked

and felt "a little betrayed" by the District.  Tr. at 753-54.  "I didn't feel that they were telling me it was this bad while [J.R.] was there," she testified.  Tr. at 754.  "I sat in [Mr. Cotter's] office and wept as we went through them."  Tr. at 754.

The Parents unilaterally placed J.R. at GOW for the remainder of the 2015-16 school year at the cost of $24,760.  Tr. at 493-94, 754.  They provided written notice to the District of their intent to seek reimbursement on December 17, 2015.  Exh. D-6.  The District denied the request for reimbursement, maintaining that J.R. was not in need of special education support and that her 504 Plan was appropriate.  Exh. D-7, Tr. at 172-74.  Prior to the start of the 2017-2018 school year, J.R.'s 11th grade year, the Parents notified the District of their intention to continue J.R. at GOW.  Ex. P-W.  The District reiterated its previous position that J.R.'s fluency deficits could be properly addressed through her 504 Plan, and denied the reimbursement request.  Exh. P-Y.

**GOW**

GOW is a small, private college-preparatory school, accredited by the New York Chapter of the National Association of Independent Schools, for students in grades 6 through 12 with dyslexia and other language-based learning disabilities.  Tr. at 474-75, 478, 529, 540, 587.  GOW students typically have average intelligence but have deficits in their reading and writing abilities.  Tr. at 479.  The particular focus of GOW is remediation of language-based learning disabilities and helping students with such disabilities to get into college.  Tr. at 476.  The student body is approximately 145 students with approximately 40 teachers.  Tr. at 480.  All of the

teachers at GOW are trained in the Reconstructive Language Program, a multisensory, phonetically-based intensive remediation program used to develop automaticity in reading, alphabetic knowledge and comprehension strategies.  Tr. at 531, 629. Although most students reside at GOW, J.R. attended as a day student.  Tr. at 481.

**The Due Process Hearing**

On November 18, 2016, the Parents initiated the underlying proceeding by submitting a request for an impartial due process hearing, seeking compensatory services as well as reimbursement for J.R.'s tuition to attend GOW from January 2016 through the end of the 2016-17 school year.  Dkt. No. 20-1, ¶ 48; Exh. D-1.  A hearing was held before Impartial Hearing Officer, Lynn Botwinik Almeleh, Esq. ("the IHO") over four days:  June 21, 2017, July 25, 2017, and September 26-27, 2017.  Dkt. No. 20-1, ¶ 50.

**The IHO's Decision**

On December 28, 2017, the IHO issued a decision in which she concluded that:  the District compromised J.R.'s access to a FAPE by removing her corrective reading program in September 2014 (Dkt. No. 20-2, p. 35); the District inappropriately relied exclusively on J.R.'s "academic achievements" in declassifying her (Dkt. No. 20-2, pp. 37-39); GOW was an appropriate placement for J.R. during the latter half of the 2015 school year and the 2015-2016 school year (Dkt. No. 20-2, pp. 42-44); the Parents were entitled to reimbursement of the tuition they paid to GOW, reduced by 20%, based on their refusal to further discuss with the District educational planning for their daughter

(Dkt. No. 20-2, pp. 44, 46); and although the Parents were entitled to compensatory services, specifically, a corrective reading program, it was already included in the GOW curriculum (Dkt. No. 20-2, p. 45).

The District appealed from the IHO's Decision to New York's Office of State Review. Dkt. No. 20-1, ¶ 53. The Parents cross-appealed from that portion of the IHO's decision, holding that they were not entitled to full reimbursement, but only 80%. Dkt. No. 20-1, ¶ 53.

**The SRO's Decision**

On April 11, 2018, SRO Steven Krolak entered a decision reversing the IHO's decision, sustaining the District's appeal, and dismissing the parents' cross-appeal. Dkt. 20-3, pp. 1-24. The SRO explicitly held that "at the time the parents and the district agreed to remove the student's reading program in September 2014, such decision was reasonable in light of the information available . . . as it [was] clear the student had the skills and strategies in reading necessary to access and progress in the general education curriculum." Dkt. No. 20-3, p. 16. The SRO found that the IHO erroneously relied on the results of the December 2015 GOW evaluation, as it was conducted 16 months after the District's decision to remove the corrective reading program, and therefore constituted "retrospective evidence." Dkt. No. 20-3, p. 16 n.14.

The District's failure to evaluate J.R. prior to finding her ineligible for special education, while erroneous, was a "procedural violation that does not rise to the

level of a denial of a FAPE," the SRO found.  Dkt. No. 20-3, p. 17.  The SRO concluded

that, "the May 2015 CSE had sufficient information to identify the student's needs,

whether or not commonly linked to the student's disability category, and [to] determine

that the student did not require special education to access the general education

curriculum or [to] derive educational benefit."  Dkt. No. 20-3, p. 17.  Regarding the

substantive decision to declassify J.R., the SRO held that:  although J.R. had a

qualifying disability, she did not require supports outside of those provided in her 504

Plan which qualified as "special education" (Dkt. No. 20-3, pp. 18-21); the IHO engaged

in "improper retrospective analysis" when in contradicting the CSE's 2015 decision to

declassify the student, she cited to evidence that J.R. experienced post-declassification

anxiety (Dkt. No. 20-3, p. 21); and therefore, "the IHO erred by finding the District

denied the student a FAPE for the 2014-15, 2015-16, [and] 2016-17 school years, and

by finding that the student was entitled to compensatory relief, and by awarding partial

tuition reimbursement."  Dkt. No. 20-3, p. 23.


**The Litigation**

Plaintiffs commenced this action on August 3, 2018, seeking judgment

that the District failed to provide J.R. with a FAPE in violation of the IDEA, tuition

reimbursement, and costs and attorneys' fees.  Dkt. No. 1.  The District filed a motion

for summary judgment on June 4, 2019 (Dkt. No. 20), and the Parents cross-moved for

summary judgment on July 26, 2019 (Dkt. No. 22).

## DISCUSSION AND ANALYSIS

**Was J.R. Denied A FAPE?**

Where an IHO and SRO render conflicting decisions, courts should defer to the final administrative decision rendered, that is, that of the SRO, on all matters requiring educational expertise. *R.E.*, 694 F.3d at 189; *W.A.*, 927 F.3d at 143. Underlying this principle is the understanding that the court may not substitute its "own views on educational policy for those of the school authorities." *W.A.*, 927 F.3d at 143. "[R]ather than credit[ ] the conclusions that were most consistent with its own subjective analysis, the reviewing court should only reject the SRO's conclusions if it finds that they are not supported by a preponderance of the evidence." *W.A.*, 927 F.3d at 149 (internal quotations and citations omitted). For the reasons that follow, this Court finds that the SRO's decision is well reasoned and supported by legally sufficient evidence.

The Parents predicate their claim for reimbursement on the District's September 2014 decision to remove J.R.'s corrective reading program; and the District's May 2015 decision to declassify J.R., rendering her ineligible for special education services under the IDEA.[8]  This Court will address each alleged error, and the SRO's analysis thereof, in turn.

---

[8] As previously noted, the District determined in May 2015 that J.R. should receive various accommodations to address her reading fluency deficits, including additional time to complete activities, under her 504 Plan, rather than special education services delivered pursuant to an IEP.

**September 2014 Removal of J.R.'s Corrective Reading Program**

With respect to the District's decision to remove J.R.'s corrective reading program, the SRO found that it was reasonable "[i]n light of the information available at the time" because "the student had skills and strategies in reading necessary to access and progress in the general education curriculum." Dkt. No. 20-3, p. 16. The SRO acknowledged the District's stated reasons for removing the program, specifically, that J.R. was on the honor roll throughout the middle school and had achieved her reading goal. Dkt. No, 20-3, p. 14; Exh. D-35 at 1. There is no dispute that J.R. had outstanding grades in the academic year prior to removing the reading program. Dkt. No. 20-3, p. 15 (the SRO acknowledging J.R.'s final overall average of 95.92, and in particular, her final average of 95 in ELA for the 2013-2014 school year); Exh. D-63. Even the IHO, who found that the removal of the program was erroneous, recognized that "there is no doubt that J.R.'s progress demonstrated an upward trend," even as she continued to show significant deficits with reading fluency. Dkt. No. 20-2, p. 35.

The Parents argue that the "SRO failed to engage in a careful analysis of the record" and erroneously credited the testimony of Ms. Kendall-Jakus that J.R. had mastered her 7th grade reading goals. Dkt. No. 22-1, p. 9. This Court does not agree. The SRO acknowledged the reading fluency evidence presented by the District at the hearing, but explicitly declined to credit any of it. "Although the district submitted evidence that it monitored the student's reading progress during the 2013-14 school year," the SRO stated, "the information presented is confusing and inconsistent." Dkt. No. 20-3, p. 14. The SRO detailed the AIMSweb progress monitoring reports from

October 2013 to February 2014, and for the 2013-2014 school year, and the narrative report of J.R.'s progress toward her fluency goal measured in April and June 2014, which as noted herein, generated conflicting results.  Dkt. No. 20-3, p. 14; Exh. D-55, 56, 59.  The SRO noted—but did not endorse—Ms. Kendall-Jakus' opinion that, based on her AIMSweb scores, J.R. made "excellent progress" "almost doubl[ing] the expected rate of progress."  Dkt. No. 20-3, p. 14.

This Court agrees that it is unclear whether J.R. mastered her 7th grade fluency goal based on the District's evidence.  But the apparent inconsistencies in the progress monitoring is immaterial to whether the SRO's decision is sound as he did not base his decision on J.R.'s fluency progress.  Rather, the SRO found that the District was justified in removing the reading program because during the prior academic year (8th grade), J.R. achieved excellent grades in an unmodified, general education curriculum, and demonstrated average reading comprehension (as opposed to reading fluency) skills compared with her middle school peers, facts which are undisputed.  Exh. D-56 at 2; Exh. D-63; Tr. at 128-29, 133-35, 330.

The Parents argue that "the SRO afforded primacy to J.R.'s grades above all other considerations, contrary to the law of this Circuit."  Dkt. No. 22-1, p. 12.  This is not an accurate characterization of the SRO's decision, which clearly emphasized J.R.'s on-par reading comprehension skills, as well as her good grades.  To quote the SRO:

> Thus, while it is unclear if the student met her IEP goal of reading 150
> words correct at the 7th grade level or what reading level . . . was being
> used to measure the student's reading fluency, the student performed well
> in the general education curriculum throughout the 2013-2014 school

> year.  Additionally, although the student's reading fluency continued to be
> below average as compared to other students in the middle school, the
> student's reading comprehension was in the average range (Tr. [at] 128-
> 129; Dist. [Exh]. 56 at . .  2).

Dkt. No. 20-3, p. 16.  Although the Parents are correct that passing grades are not the

end of the inquiry, Dkt. No. 22-1, pp. 8-9, neither are grades completely irrelevant.

Indeed, while not "every handicapped child who is advancing from grade to grade in a

regular public school system is automatically receiving a 'free appropriate public

education[,]'" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v.

Rowley*, 458 U.S. 176, 203 n.25 (1982), "[t]he grading and advancement system . . .

[does] constitute[ ] an important factor in determining educational benefit."  *Id.* at 203;

*see also Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d 87, 93 (2d Cir. 2003)

("Passing grades are, of course, often indicative of educational benefit.").  Moreover, in

assessing a reading fluency deficit in particular, "[h]ow much weight is due any given

measure . . . must depend on the unique circumstances of the child" and is left to "the

IEP team [or] the hearing officer . . . to determine, in the first instance and on an

individual basis, the precise weight of any and all relevant measures . . . ."  *Doe v. Cape

Elizabeth Sch. Dist.*, 832 F.3d 69, 81 (1st Cir. 2016).


It bears noting that J.R. was not merely passing classes with modified

curricula, she was excelling in the general education curriculum.  J.R.'s case is thus

distinguishable from *W.A.*, 927 F.3d 126, which the Parents argue "compels reversal [of]

the SRO's finding[ ]" that it was proper to remove the reading program simply because

J.R. had good grades.  Dkt. No. 22-1, p. 13.[9]  The student's grades in *W.A.* were within

the A- to C+ range, described as "passing," "average," and "satisfactory."  *W.A.*, 927

F.3d at 135-36, 140.  The student was also being taught in a classroom with a student-

teacher ratio of less than 8:1.  *W.A.*, 927 F.3d at 135.  Had J.R. been getting middling

grades while in a self-contained classroom, the CSE might have needed to convene to

decide whether to remove her corrective reading program.  J.R.'s case, however,

---

[9] In *W.A.*, the Second Circuit Court of Appeals found that although the student (who suffered
from migraines) was performing well academically at Northwood, the private school where he
was unilaterally placed, the school was nonetheless inappropriate, because it was not
"equipped to address" the "emotional and psychological issues" underlying the student's
migraines.  *W.A.*, 927 F3d at 138, 146-147.  For example, Northwood did not employ a
psychologist.  *Id.* at 138.

In reaching its decision, the W.A. Court reasoned:

> We therefore affirm the district court's deference to the SRO's ruling that Northwood
> School was not an appropriate placement entitling the Parents to tuition reimbursement
> for ninth grade.  While the Parents argue that the State failed to consider fully
> Northwood's responsiveness to W.E.'s unique needs and the significant improvements
> he experienced while enrolled at the private school—including his momentous increase
> in attendance—the SRO's opinion reflects that it considered the relevant evidence of
> W.E.'s progress.  For instance, the SRO noted that "the hearing record supports a
> finding that the student's social/emotional and academic functioning improved since the
> end of the 2010-11 school year, . . . and that the student achieved some progress
> academically during the 2011-12 school year" while simultaneously citing reports from
> W.E.'s teachers describing his inconsistent level of academic effort, timeliness, and
> preparation.  Sp. Supp. App. 84.  The SRO also properly cited this Court's decision
> in *Gagliardo*, 489 F.3d at 115, for the proposition that a student's progress in a
> unilateral placement, while relevant to the court's inquiry, cannot alone demonstrate
> the appropriateness of that placement.
>
> Indeed, the crux of the SRO's decision was not that W.E. failed to progress at
> Northwood, but, rather, that:
>> the hearing record lacks evidence demonstrating that [Northwood] provided
>> instruction that was designed to address the student's tendencies to develop
>> physical symptoms and exhibit school avoidance when under stress, or his need
>> to develop coping skills to manage stress related to academics and social
>> interactions, and to improve his organizational/study skills related to academics,
>> and, that the instruction that the student received during the 2011-12 school year
>> was, in fact, available to all students enrolled at [Northwood].

*W.A.*, 927 F.3d at 146-47.

presented a much more straightforward situation. *See Walczak*, 142 F.3d at 130 ("A review of objective evidence is easiest, of course, when a disabled child is in a mainstream class. In such circumstances, the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress."). Moreover, the SRO's decision makes clear that in addition to J.R.'s grades, he considered that J.R.'s reading comprehension skills were "average" compared with her peers on standardized testing measures. Dkt. No. 20-3, p. 16. These were appropriate and sufficient grounds upon which to base his decision.

To the extent that the Parents challenge Ms. Kendall-Jakus' failure to call a CSE meeting before removing the corrective reading program, this Court finds that it did not amount to the denial of a FAPE for J.R. The Parents do not dispute that they requested that the reading program be removed from J.R.'s IEP. Rather, they contend that the District was not transparent about the extent of J.R.'s deficits in reading fluency, in particular about J.R.'s fluency goals and progress. The Parents have not cited to any evidence or inconsistency with the District's position that J.R. "mastered" her goals of reading 150 words per minute at a 7th grade level. Dkt. No. 25, p. 10.[10] Instead, they contend that that because J.R. attained this goal only once, she did not master it. Dkt. No. 22-1, p 10 (citing to the IHO's reasoning (Dkt. No. 20-2, p. 34) that "a skill is not 'acquired' until demonstrated across time throughout various settings"). Whether J.R. actually "mastered" her reading goals is not for this Court to decide. *R.E.*, 694 F.3d at

---

[10] The District cites to evidence that J.R. achieved her goal of reading 150+ words a minute on a 7th grade reading probe on five occasions between 10/04/2013 and 2/05/2014. Dkt. No. 25, p. 10.

184 (holding that courts should defer to administrative review officers on educational

matters, because "the judiciary generally lacks the specialized knowledge and

experience necessary to resolve persistent and difficult questions of educational

policy.").  It is also unnecessary for this Court to make a factual determination on this

issue because, as previously noted, the SRO based his decision on other factors.  In

any case, in light of the fact that the Parents requested that the reading program be

removed from J.R.'s IEP, there is no basis to believe that if the CSE had convened in

September 2014, it would have decided to keep the reading program in place.


This Court thus finds that there were no legal or factual errors underlying

the SRO's conclusion that the District acted appropriately in removing J.R.'s corrective

reading program.  Accordingly, the undersigned finds that his reasoning related to this

issue is entitled to deference.


**The May 2015 Decision to Declassify J.R.**

The Parents argue, contrary to the SRO's ruling, that the procedural

irregularities in declassifying J.R. denied her a FAPE.  Dkt. No. 22-1, p. 18.  The

Parents contend that the District failed to measure J.R.'s reading fluency; erroneously

"led [them] to believe that J.R.'s classification status was preventing her from attending

advanced classes;" and did not properly evaluate J.R. despite the risk that her

extraordinary work ethic could mask her learning disabilities.  Dkt. No. 22-1, pp. 18-20.

The District contends that it fully complied with the regulatory provisions related to re-

evaluation, but that there is "a discretionary component with respect to whether a

reevaluation is necessary to assess the student's current needs and abilities and whether the existing evaluative data is sufficient to make a declassification determination."  Dkt. No. 25, p. 21 (citing *Application of a Child with a Disability*, Appeal No. 04-066 (2004)).[11]

Where a school district has previously classified a student as one "with a disability," it must evaluate that student prior to declassifying him or her as such.  8 NYCRR § 200.4(c)(3).  Consistent with federal and state regulations, the CSE, consisting of a group of qualified professionals and the child's parent(s), must review existing evaluation data on the child, including information provided by the parents, and current classroom-based assessments and observations from teachers and other related service providers.  *See* 20 U.S.C. § 1414(c)(1)(A); 8 NYCRR §§ 200.4(b)(5)(i), 200.4(b)(5)(ii); 200.4(b)(4).  The CSE must include at least one teacher or other specialist with knowledge in the area of the student's disability.  *See* 8 NYCRR § 200.4(b)(4).  The CSE must determine what evaluative data, if any, is required to conduct such a reevaluation, but it must be "sufficient to determine the student's individual needs, educational progress and achievement, the student's ability to participate in instructional programs in regular education and the student's continuing eligibility for special education."  *See* 8 NYCRR §§ 200.2(b)(8); 200.4(b)(4); 200.4(b)(5). If the CSE determines that no additional data is needed to determine whether the child continues to be a student "with a disability," it shall notify the child's parents of that determination and the reasons underlying it, and also must inform the parents of their

---

[11] Available at https://www.sro.nysed.gov/decision/2004/04-066

right to request an assessment.  *See* 20 U.S.C.§ 1414(c)(4)(A); 8 NYCRR §§

200.4(b)(5)(iv); 200.5(a)(5)(i).[12]  The school district is not required to conduct the

assessment unless requested to do so by the student's parents.  *See* 8 NYCRR §

200.4(b)(5)(iv).

       The Parents contend that "[a]bsolutely none of these things occurred with

J.R."  Dkt. No. 22-1, p. 18.  This Court does not agree.  As an initial matter, J.R.'s CSE

appeared to be appropriately comprised, in that it included the District's school

psychologist, with whom J.R.'s mother was on a first name basis (Tr. at 744), J.R.'s

school counselor, her general education teacher, her special education teacher, and

both of her parents.  Exh. D- 42 at 2; Exh. D-45 at 2; 8 NYCRR § 200.4(b)(4).  The

Parents were at all times in agreement that J.R. should be declassified.  In the months

leading up to J.R.'s declassification, J.R.'s mother appeared to insist that GOW conduct

J.R.'s triennial evaluation rather than the District, as GOW had done 3 years prior.  Tr.

at 379 (Ms. Albrechcinski testifying "J.R. was due for [her triennial] re-evaluation.  Mrs.

D.M.R. preferred to go to GOW to have the re-evaluation completed, so that was

honored by myself");  Exh. D-42 at 1 (12/8/2014 Meeting Minutes stating, "Discussed re-

evaluation. Mom will have one completed at GOW this coming Summer"); Exh. D-43 at

1 (12/15/2014 Prior Written Notice stating, "[J.R.] will receive an outside evaluation as

---

[12] Additionally, once the CSE determines that the student no longer needs special education services, it must consider and include in its recommendation any declassification support services that the student requires prior to placing the student in a full-time regular education program.  8 NYCRR  § 200.4(d)(1)(iii).  The record shows that the District met in May 2015, contemporaneously with J.R.'s declassification, to create a 504 Plan to address her reading fluency deficits.  Exh. D-44.

per parent").  In this regard, the Parents were exercising control over when J.R. would

be re-evaluated, and by whom.  To the extent that the Parents claim that they were not

notified about testing, this Court finds the assertion to be disingenuous.  Tr. at 382, 744-

45 (Ms. Albrechcinski testifying that J.R.'s parents were in "full support" of declassifying

J.R. and did not request any updated testing).


In May 2015, the CSE considered J.R.'s grades and credits, as well as

reports from J.R., her parents, her teachers, and her counselor, and determined that

they had sufficient information to recommend declassification without conducting further

evaluations.  Exh. D- 46, p. 1; Tr. at 381, 384-85, 436.  In the Prior Written Notice, the

CSE wrote that J.R. "is a success in all of her academic classes and seeks out

assistance independently as needed."  Exh. D-46 at 1.  This is appropriate information

upon which to predicate a student's declassification under the regulations.  *See* 8

NYCRR § 200.4(b)(4).  It was also an accurate assessment of J.R.'s academic

performance in an unmodified, general education curriculum, which is supported by the

record.  Exh. D-64 (reflecting that J.R.'s final GPA for the 2014-2015 school year was

94.8); Tr. at 304-305, 310-11, 330 (J.R.'s special education teacher testifying that J.R.

received the same curriculum as her non-disabled, general education peers, and that

J.R. "very rarely" utilized her support in her English and study hall classes).  Regarding

the Parents' suggestion that they only agreed to declassify J.R. because she would

otherwise be foreclosed from advanced placement classes, this is not borne out by the

record.  There is no mention of it in any of the meeting minutes or notices relating to

J.R.'s declassification.  J.R. did not enroll in any advanced placement classes.  And Ms.

Albrechcinski testified that a child with an IEP would be allowed to take any class in the District if they were capable.  Tr. at 432.

        The District did err by not itself assessing J.R. prior to declassifying her, rather than deferring to the Parents' preference that GOW evaluate her.  But it was not unreasonable for the SRO to find that this procedural error did not amount to the denial of a FAPE given that the Parents were actively engaged and the CSE had sufficient information to declassify her.  As the SRO reasoned,

> This is not a case where declassification was briefly discussed and accompanied by a flurry of procedural violations that significantly impeded the parents' ability to participate in the decision making process (see Application of a Student with a Disability, Appeal No. 15-099); rather, the student's potential declassification was a focus of the December 2014 CSE meeting and the issue was revisited and determined at the May 2015 CSE meeting where declassification of the student officially occurred. There is no dispute that the student had a classifiable disability and, as discussed in further detail below, the May 2015 CSE had sufficient information to identify the student's needs, whether or not commonly linked to the student's disability category, and [to] determine that the student did not require special education to access the general education curriculum or [to] derive [an] educational benefit.

Dkt. No. 20-3, p. 17.  This Court agrees with the SRO that, at all times, the Parents were able to meaningfully participate in their daughter's educational planning and that the CSE had legally sufficient information upon which to base its decision to declassify her, even absent updated testing.  *See, e.g., C.R. v. New York City Dep't of Educ.*, 211 F. Supp. 3d 583, 609 (S.D.N.Y. 2016) (holding that a preponderance of the evidence indicates that the CSE had sufficient and accurate information to understand and describe the student's levels of performance and needs, even without the participation

of one of his teachers, because the CSE had two recent classroom observations and input from his parent and teacher).

The SRO is likewise correct that "not every procedural error results in the denial of a FAPE."  Dkt. No. 20-3, p. 17; *M.H.*, 685 F.3d at 245; *see also Grim*, 346 F.3d at 381 (agreeing that "it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA").  Rather, relief is warranted only if the alleged procedural violations "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the [decision-making] process regarding the provision of [a FAPE]," or otherwise "caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii); *Lesesne ex rel. B.F. v. D.C.*, 447 F.3d 828, 834 (D.C. Cir. 2006) (citing cases for the proposition that "an IDEA claim is viable only if . . . procedural violations affected the student's *substantive* rights").

This Court finds that the SRO's conclusions that J.R. was not impeded and that the CSE had sufficient information are well reasoned and therefore, entitled to deference.  *W.A.*, 927 F.3d at 144 (reiterating that a reviewing court must ultimately defer to the SRO's decision on matters requiring educational expertise unless "the decision was inadequately reasoned," and that the court's determination of persuasiveness must at all times be "colored by an acute awareness of institutional competence").  The related question of whether J.R. was deprived of an educational

benefit to which she was entitled by virtue of being declassified warrants further discussion.

Under the IDEA, school districts must provide "special education and related services" to all qualifying students with disabilities.  20 U.S.C. § 1400(d)(1)(A).  The IDEA defines a "child with a disability" as a child:  "(i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) **who, by reason thereof, needs special education and related services**."  20 U.S.C. § 1401(3)(A) (emphasis added).  There is no dispute that J.R. has a disability, specifically, dyslexia, which manifests itself through difficulties in timed tasks, and especially in reading fluency.  Tr. at 400-401, 419; Exh. D-71 at 3.  The parties disagree as to the second prong; that is, whether because of her dyslexia, J.R. **required** special education services after May 2015 in order to make meaningful educational progress in the District.

In deciding that it was appropriate for the CSE to declassify J.R. in May 2015, the SRO noted "special education" is defined as "specially designed individualized or group instruction or special services or programs," 8 NYCRR § 200.1(ww), and "specially designed instruction" is defined as "adapting, as appropriate to the needs of an eligible student . . . the content, methodology, or delivery of

instruction to address the unique needs that result from the student's disability; and to

ensure access of the student to the general curriculum so that he or she can meet the

educational standards that apply to all students." 8 NYCRR § 200.1(vv). The SRO also

acknowledged that "a child who needs only accommodations or services that are not

part of special education to fulfill the objective of the need inquiry does not 'need'

special education." *Doe*, 832 F.3d at 85.

After examining in detail the accommodations in J.R.'s May 2015 504

Plan, which governed what services she would be provided post-declassification, the

SRO concluded:

> Overall, I do not find that the accommodations provided in the 504 plan,
> which are designed to provide the student with extra time and help with
> focusing her attention rather than an adaption of the content, methodology
> and delivery of instruction, meet the definition of specially designed
> instruction (see Ashli C. v. State of Hawaii, 2007 WL 247761 at *10-*11
> (D. Haw. Jan. 23, 2007) (identifying additional time highlighting and taking
> tests, being moved closer to the teacher, and having test directions read
> aloud as not being special education).

Dkt. No. 20-3, p. 20. The SRO concluded that J.R. did not require supports outside of

those recommended in the 504 Plan which constitute "special education," citing to the

following evidence of J.R.'s success in the general education curriculum: her

outstanding grades during the 2014-2015 school year; the fact that J.R. did not receive

reading support during this time, and her special education teacher did not observe

anything indicating that she needed it (Tr. at 307-308); testimony that in the classroom,

J.R. was able to read and answer questions without extra help or explanation; her final

grade of 97 in her general education English with co-taught services (Tr. at 308-309);

and testimony that J.R. rarely asked for help in the small group study hall (Tr. at 310-

11).  Dkt. No. 20-3, p. 21.  This is all accurate information that is probative of whether J.R. required "specially designed instruction" to access the general education curriculum.

The SRO noted that in the year following her declassification, evaluations of J.R. by the District psychologist and the GOW examiner revealed average cognitive ability, weaknesses in working memory, fluency deficits, and according to GOW's evaluator, "weaknesses characteristic of dyslexia."  Dkt. No. 20-3, p. 23.  As before, J.R.'s deficits were centered in the area of reading fluency (relating to how fast she could read) rather than reading comprehension (the ability to understand the material).  The GOW examiner testified that fluency deficits could be addressed through accommodations, such as providing extra time for tasks, rather than through special education.  Dkt. No. 20-3, p. 23.  In this regard, had the CSE tested J.R. prior to convening in May 2015 as it should have, it likely still would have declassified her and transitioned to a 504 Plan to help her with reading fluency.

The SRO declined to consider, as the IHO did, testimony that after she was declassified, J.R. became very anxious about school.  As an initial matter, the Parents reported that J.R. was frustrated and anxious because her teachers were not consistently implementing her 504 Plan, not because she was no longer receiving special education.  Tr. at 752-53, 755-57; Exh. D-48; Exh. P-CC.  It is undisputed that the Parents never requested that J.R. be reclassified for special education or that she receive services that could be classified as special education.  Tr. at 225-26, 387.

Therefore, the Parents' primary grievance was with the implementation of J.R.'s 504

Plan rather than with her declassification.  As the SRO correctly noted, "an SRO has no

jurisdiction to review any portion of a parents claims or an IHO's findings regarding

section 504."  Dkt. No. 20-3, p. 10.  And, in any case, a challenge to a 504 Plan cannot

form the basis for tuition reimbursement under the IDEA.  *Janet G. v. State of Hawaii*,

410 F. Supp. 2d 958, 966-67 (D. Haw. 2005).  Secondarily, as the SRO noted, the CSE

could not have known prior to declassifying J.R. that she would develop anxiety.  Under

the circumstances, this Court agrees that the IHO engaged in impermissible

retrospective analysis when she cited to J.R.'s post-declassification anxiety as proof

that the decision to declassify her was improper at the time.  Dkt. No. 20-3, p. 21.


        The Parents argue that the IHO's analysis was "qualitatively superior" to

the SRO's and "reflected a much more accurate, thorough and nuanced understanding

of the record."  Dkt. No. 22-1, p. 17.  However, this is not the standard for a court

reviewing state educational decisions.  Only where "an SRO's decision is **inadequately**

reasoned" may a reviewing court consider a "better reasoned IHO opinion."  *Reyes ex*

*rel. R.P. v. New York City Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) (emphasis

added).  Having reviewed the record and the IHO's and SRO's decisions in their

entirety, this Court finds that the SRO's decision is very well-reasoned and, at a

minimum, supported by a preponderance of the evidence.  The quality of the SRO's

reasoning is abundantly clear in the closing paragraph of his analysis:

> The issue of whether a student requires special education is not always
> clear, because some services described by special education teachers
> and providers appear at times to be similar to services that are provided to
> regular education students.  Nevertheless, this student has never needed

a modified curriculum even when receiving services pursuant to an IEP
and has consistently performed in an exceptional manner academically.
Although the district should have evaluated the student prior to
declassification, because the hearing record (including the subsequent
September 2015 and December 2015 [assessments]) supports finding
that the student did not require special education, the May 2015 CSE's
decision to declassify the student was appropriate.

Dkt. No. 20-3, p. 23.


Based on the foregoing, this Court finds that the SRO's conclusion that the

District did not deny J.R. a FAPE is supported by the evidence and his analysis is well-

reasoned.  Consistent with the law of this Circuit, the SRO's decision is entitled to

deference.  The Parents' request for tuition reimbursement should be denied.


**Unilateral Placement at the GOW**

The SRO did not reach the question of whether GOW was an appropriate

private placement for J.R.  This Court, having endorsed the SRO's conclusion that J.R.

did not require special education services, finds that her placement at GOW in an

intensive reconstructive reading program with only disabled students was not

appropriate.[13]  The record shows that, while at the District, J.R. excelled at learning in

an unmodified curriculum in co-taught or general education classes with non-disabled

peers.  At GOW, J.R.'s schooling consisted of intensive reading intervention delivered in

extremely small classes comprised only of disabled students.  Tr. at 475, 481, 530-31.

In this regard, GOW was extraordinarily restrictive in both substance and structure for a

student like J.R.

---

[13] This issue is being addressed solely in the event that the District Judge finds that J.R. was, in
fact, denied a FAPE.

"[W]hile a parental placement is not inappropriate simply because it does not meet the least-restrictive-environment requirement, it is nonetheless proper for a court to consider the restrictiveness of the private placement *as a factor* when determining the appropriateness of the placement." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014); *see also Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 550-51 (S.D.N.Y. 2010) (holding that the parents were not entitled to reimbursement because the school at which they unilaterally placed their child was too restrictive and otherwise inappropriate).

While J.R. performed "exceptional[ly]" at GOW, this in and of itself constitutes evidence that J.R. did not require the intensive level of reading intervention GOW offers.  Tr. at 547.  For example, J.R. memorized all 113 of the reconstructive language cards within the first semester, a performance that was "rare" according to Chairperson of GOW's Reconstructive Language Program.  Tr. at 532-37, 558-62.  In this regard, J.R.'s success at GOW can just as easily be construed against the Parents as for them on the issue of whether GOW was an appropriate placement.  Deferring, as it should, to the SRO's conclusion that J.R. did not require special education, this Court finds that J.R.'s extraordinary performance at GOW supports the finding that she did not require GOW's reading program to succeed academically.  In any case, "[e]ven where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by

parents of any child, disabled or not." *Gagliardo*, 489 F.3d at 115.  This constitutes an alternative basis to deny the Parents' claim for reimbursement under the IDEA.


**Remaining Claims**

This Court has concluded that the SRO's decision against tuition reimbursement is entitled to deference and has identified an alternative basis for denying the Parent's IDEA claim.  Accordingly, it need not address the Parent's argument that the IHO erred in reducing their tuition reimbursement by 20% based on equitable factors.  Dkt. No. 22-1, p. 29.  Moreover, having agreed with the SRO that the removal of J.R.'s corrective reading program did not constitute the denial of a FAPE and recognizing that the IHO never awarded any compensatory services, this Court finds no factual basis for the Parents' request for compensatory services.


The Parents have apparently abandoned their cause of action under Section 504 of the Rehabilitation Act.  *See, generally,* Dkt. No. 22-1; Dkt. No. 28; *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985) (holding that a party opposing summary judgment "may not stand mute in reliance solely upon its allegations when facing a substantial evidentiary submission refuting its claim").  Based on the record before it, this Court finds that the District is entitled to summary judgment on the Parents' Rehabilitation Act claims.

The law is clear that a plaintiff may assert a Section 504 claim in conjunction with an IDEA claim on the theory that he has been "denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive[.]"  *C.L.*, 913 F. Supp. 2d at 836.  To recover under the Rehabilitation Act, a party must prove: (1) that the student is disabled; (2) that the student is "otherwise qualified" to participate in school activities; (3) the school or the board receives federal financial assistance; and (4) the student was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.  *Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005).

A showing of discrimination under Section 504 "requires something more than proof of a mere violation of IDEA." *J.D. v. Pawlet School Dist.,* 224 F.3d 60, 70 (2d Cir. 2000).  Rather, there "must be evidence that a school district acted with deliberate or reckless indifference to the student's federally protected rights or with "bad faith or gross misjudgment."  *Schreiber*, 700 F. Supp. 2d at 564.  Based on this record and the Parents' failure to brief this claim, it cannot be said that they have demonstrated "bad faith" or "gross misjudgment" on the part of the District.

Accordingly, this Court finds that the District is entitled to summary judgment and the Parents' Rehabilitation Act claims should be dismissed as a matter of law.  *Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477, 484 (S.D.N.Y. 2007) (holding that summary judgment in favor of the district was appropriate

where the parents' "Rehabilitation Act claims are, in actuality, merely restatements of their IDEA claims—that Defendant failed to appropriately classify [their child]"); *Zahran ex rel. Zahran v. New York Dep't of Educ.*, 306 F. Supp. 2d 204, 213 (N.D.N.Y. 2004) (dismissing the parents' Rehabilitation Act claim after finding that they were "essentially challenges to the program itself, not of any type of discriminatory decisions" and therefore, were substantially the same as their IDEA claim).

## <u>CONCLUSION</u>

For the foregoing reasons, it is RECOMMENDED that the District's Motion for Summary Judgment (Dkt. No. 20) be GRANTED and the Parents' Cross-Motion for Summary Judgment (Dkt. No. 22) be DENIED.

It is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an

extension of such time waives the right to appeal the District Court's Order.  *Thomas v.*

*Arn*, 474 U.S. 140, 155 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.

1988).


The parties are reminded that, pursuant to Rule 72(b) of the Local Rules

for the Western District of New York, "Written objections to proposed findings of fact and

recommendations for disposition submitted by a Magistrate Judge pursuant to 28

U.S.C. § 636(b)(1)(B) shall specifically identify the portions of the proposed findings and

recommendations to which objection is made and the basis for each objection, and shall

be supported by legal authority."  Failure to comply with the provisions of Rule 72(b)

may result in the District Judge's refusal to consider the objection.


**SO ORDERED.**


DATED:        Buffalo, New York
              November 24, 2020


                              *s/ H. Kenneth Schroeder, Jr.*
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**